KEENE FIVE–CENT SAV. BANK v. LYON COUNTY OF STATE OF IOWA.

FAULKNER v. SAME.

(Circuit Court, N. D. Iowa, W. D.    November 26, 1898.)

1. JURISDICTION OF FEDERAL COURTS—ASSIGNEE OF MUNICIPAL BONDS—INSTRUMENTS PAYABLE TO BEARER.

County bonds issued with the space for the name of the payee left blank are, in legal effect, instruments payable to bearer, within the meaning of the act of August 13, 1888 (25 Stat. 434); and a transferee having the requisite citizenship, to whom they were transferred in the same condition by delivery, may sue thereon in the federal court, though the original holder could not.

2. MUNICIPAL CORPORATIONS—FIXING LIMIT OF INDEBTEDNESS—STATUTE GRANTING EXEMPTION FROM TAXATION.

The constitution of Iowa limits the aggregate legal indebtedness of any county or other political or municipal corporation to 5 per cent. on the value of the taxable property therein, to be ascertained by the last preceding state and county tax lists. McClain's Code 1888, § 1272, provides that for each acre of forest or fruit trees planted a fixed sum shall be exempted from taxation upon the owner's assessment for a certain number of years,—the amount to be deducted by the assessor from the valuation of his property,—provided such amount shall not exceed one-half the valuation of the realty on which the exemption is claimed. Section 1271 declares that certain classes of property shall not be taxed, and authorizes their omission from assessments. In practice, all the land of an owner is listed and assessed, without regard to a claim for exemption on account of tree planting, the number of acres of trees planted is entered upon the assessment book, and the statutory exemption thereon is deducted from the total assessment. *Held*, that such exemption is in the nature of a bounty, and does not affect the "value of the taxable property" in a county, within the constitutional provision, which, for the purpose of fixing the limit of the county's indebtedness, is the total valuation placed upon such property, without deducting the amount of the exemption.

3. SAME—COMPUTING OUTSTANDING INDEBTEDNESS—EXCESSIVE ISSUE OF BONDS.

Where an issue of bonds by a county was in excess of the constitutional limit of its indebtedness, such bonds did not constitute a valid and en-

forceable debt which is to be considered in computing the county's indebtedness at the time of a subsequent issue, made while they were outstanding, though they were afterwards redeemed, as such fact did not validate them as of any date prior to that of their payment.

4. SAME—UNLIQUIDATED CLAIMS.
In computing the existing indebtedness of a county on the date of the issue of bonds, unliquidated claims, which had not been filed or presented to the county board for allowance, without which, under the statute, they would not constitute legal demands which would support an action against the county, are not to be considered.

5. MUNICIPAL BONDS—FUNDING BONDS OF COUNTY—PRESUMPTION OF VALIDITY.
Every presumption is in favor of the validity of negotiable bonds issued by a county for the purpose of funding its existing warrant indebtedness as authorized by statute; and to defeat such bonds, in the hands of innocent purchasers for value, on the ground that their issuance caused the indebtedness of the county to exceed the constitutional limit, the necessary facts must be clearly proven.

The parties plaintiff and defendant in the above-entitled cases, by written stipulations duly filed, waived a jury trial, and submitted the evidence to the court, from which the court finds the facts to be as follows (it being agreed that the cases should be consolidated for trial purposes):

(1) The plaintiff the Keene Five-Cent Savings Bank was when this action was brought, and is now, a corporation created under the laws of the state of New Hampshire; and the defendant county was when the suit was brought, and is now, a corporation created under the laws of the state of Iowa, the county being organized in January, 1872; and the amount involved in the controversy exceeds the sum of $2,000, exclusive of interest and costs; and the plaintiff Eliza J. Faulkner was when this suit was brought, and is now, a citizen of the state of New Hampshire.

(2) The action of the Keene Five-Cent Savings Bank is based upon certain bonds, with interest coupons, issued by the defendant, Lyon county, negotiable in form; the dates, numbers, and amounts of the bonds being as follows:

| Date. | Number. | Amount. | Date. | Number. | Amount. |
|---|---|---|---|---|---|
| June 1, 1880 | 32 | $ 500 | June 13, 1882 | 10 | $ 100 |
| " " " | 34 | 500 | " " " | 11 | 1,000 |
| " " " | 35 | 500 | " " " | 12 | 1,000 |
| " " " | 36 | 100 | " " " | 13 | 1,000 |
| " " " | 37 | 100 | " " " | 14 | 1,000 |
| " " " | 38 | 100 | " " " | 15 | 500 |
| Sept. 6, 1881 | 47 | 1,000 | " " " | 16 | 500 |
| " " " | 48 | 1,000 | " " " | 17 | 500 |
| " " " | 49 | 1,000 | " " " | 18 | 500 |
| " " " | 50 | 1,000 | " " " | 19 | 1,000 |
| June 13, 1882 | 1 | 100 | " " " | 20 | 1,000 |
| " " " | 2 | 100 | Sept. 1, 1884 | 21 | 500 |
| " " " | 7 | 100 | " " " | 22 | 500 |
| " " " | 8 | 100 | " " " | 24 | 500 |
| " " " | 9 | 100 | " " " | 26 | 500 |

The action of the plaintiff Eliza J. Faulkner is based upon certain bonds, with interest coupons, issued by the defendant, Lyon county, negotiable in form; the dates, numbers, and amounts of the bonds being as follows:

| Date. | Number. | Amount. | Date. | Number. | Amount. |
|---|---|---|---|---|---|
| June 13, 1882 | 3 | $100 | Sept. 1, 1884 | 25 | $500 |
| " " " | 4 | 100 | March 1, 1885 | 29 | 500 |
| " " " | 5 | 100 | " " " | 30 | 500 |
| " " " | 6 | 100 | " " " | 31 | 500 |
| Sept. 1, 1884 | 24 | 500 | | | |

(3) The bonds in question, with the coupons thereto belonging, were duly signed by the proper officers of Lyon county, and in form are the negotiable bonds and coupons of the county, and are the property of the plaintiffs; having been purchased by them before maturity, and for value. When issued, the blank spaces in the printed form of the bonds left for the name of the payee were not filled up, so that when the bonds were sold and delivered they were payable to ——— or order. The bonds were originally sold in this form to citizens of the state of Iowa,—those dated September 1, 1884, being sold to the First National Bank of Rock Rapids, Iowa, from which bank the plaintiffs purchased the same for value before maturity; and when delivered to the plaintiffs the blank space for the name of the payee had not been filled up. The bonds issued under date of March 1, 1885, were issued to Miller & Thompson, citizens of Iowa, for warrants held by them, and were subsequently, before maturity, sold by Miller & Thompson to E. F. Drake, a citizen of Minnesota, whose name was then written in as payee, and from whom the plaintiff Faulkner purchased these bonds for value before maturity. The bonds and coupons sued on in the two cases are past due and unpaid. Upon the bonds of June 1, 1880, there are 7 coupons unpaid; beginning with coupon No. 14, due June 1, 1887. Upon the bonds of September 6, 1881, there are 9 coupons unpaid; beginning with No. 12, coming due September 6, 1887. Upon the bonds of June 13, 1882, there are 11 coupons unpaid; beginning with No. 10, coming due June 13, 1887. Upon the bonds of September 1, 1884, there are 16 coupons unpaid, beginning with No. 5, coming due March 1, 1887. Upon the bonds of March 1, 1885, there are 16 coupons unpaid; beginning with No. 5, coming due September 1, 1887. The several issues of bonds sued one in the two cases were 10-year bonds, becoming due in 10 years from their respective dates.

(4) The first state and county tax lists for the county were those for the year 1872, and the amounts of the taxable property within the defendant county, as shown by the state and county tax lists for the various years since the organization of the county, not taking into account the property exempted from taxation by reason of the timber culture acts of the state of Iowa, are as follows, to wit:

| | | | | |
|---|---|---|---|---|
| For the year | 1872 | | $ | 499,099 96 |
| " | " | " | 1873 | 1,000,444 56 |
| " | " | " | 1874 | 997,822 62 |
| " | " | " | 1875 | 1,061,806 63 |
| " | " | " | 1876 | 1,081,356 09 |
| " | " | " | 1877 | 885,262 80 |
| " | " | " | 1878 | 889,757 85 |
| " | " | " | 1879 | 915,133 28 |
| " | " | " | 1880 | 1,066,707 00 |
| " | " | " | 1881 | 978,259 00 |
| " | " | " | 1882 | 989,550 00 |
| " | " | " | 1883 | 1,394,289 00 |
| " | " | " | 1884 | 1,437,527 00 |
| " | " | " | 1885 | 1,558,043 00 |

(5) It is further found that the exemptions under the timber culture acts of the state of Iowa on assessments against property owners in Lyon county, as shown by the state and county tax lists of Lyon county, Iowa, were for the year 1879, and for the various years since, as follows:

| | | | | |
|---|---|---|---|---|
| For the year | 1879 | | $ | 75,218 80 |
| " | " | " | 1880 | 171,551 00 |
| " | " | " | 1881 | 171,514 00 |
| " | " | " | 1882 | 175,547 00 |
| " | " | " | 1883 | 177,182 00 |
| " | " | " | 1884 | 143,208 00 |
| " | " | " | 1885 | 160,135 00 |

The tax lists of said Lyon county, Iowa, for the years 1879 to 1885, inclusive, were made up as follows: First column, name of owner; second column, part of section, name of town; third column, section or lot; fourth column, township or block; fifth column, number of acres; sixth column, value of

land or town lot; seventh column, value of personalty; eighth column, exemptions for trees under state laws; ninth column, total value for taxation. And the property assessed for taxation was entered upon the books by entering under the proper columns the name of the owner, the description of the land or lot, the number of acres, the value of the land or lot, the value of the personalty, and under column 8 the amount of exemptions for trees under the state laws, and under the ninth column the total value for taxation, as shown by columns 6 and 7, after deducting the amount entered under column 8.

(6) From the 18th day of July, 1872, to the 28th day of July, 1873, there were issued by the defendant county $55,000 of judgment bonds for the purpose of paying judgments aggregating $55,000 which had been rendered against said county, which said judgments are set out in paragraph 4 of the findings of the court in the case of Ætna Life Ins. Co. v. Lyon Co., reported in 44 Fed. 329.

(7) That from July 28, 1873, up to July 1, 1879, funding bonds were issued by the defendant county under the provisions of chapter 1, tit. 4, of the Code of Iowa for 1873, as amended by chapter 9 of the Acts of the Fifteenth General Assembly, and chapter 154 of the Acts of the Seventeenth General .Assembly, at various dates, and in amounts as follows:

| | |
|---|---:|
| October 19, 1874 | $10,000 |
| December 1, 1874 | 6,000 |
| February 16, 1875 | 1,000 |
| September 18, 1875 | 5,100 |
| October 18, 1875 | 200 |
| November 9, 1875 | 400 |
| September 6, 1876 | 20,000 |
| July 7, 1877 | 3,600 |
| February 7, 1878 | 1,000 |
| June 4, 1878 | 5,200 |
| February 19, 1879 | 1,400 |
| June 4, 1879 | 1,400 |
| | |
| Total | $55,300 |

(8) July 1, 1879, the defendant county issued $100,000 of 8 per cent. refunding bonds, under the provisions of chapter 58 of the Acts of the Seventeenth General Assembly of the State of Iowa, and upon the following resolution of the board of supervisors of said county, of date April 3, 1878:

"Whereas, in accordance with an act of the Seventeenth general assembly of the state of Iowa authorizing counties, citizens, and towns to refund outstanding bonded indebtedness at a lower rate of interest, and to provide for the payment thereof, the board of supervisors of Lyon county, Iowa, in regular session assembled, deem it for the public interest to refund all indebtedness of said county evidenced by the bonds thereof heretofore issued, and outstanding at the time of the passage of this act: Therefore, be it resolved by said board of supervisors, that the chairman of said board and the auditor of said county .are hereby authorized and empowered to issue the coupon bonds of said county, in sums not less than one hundred dollars ($100.00), nor more than one thousand dollars ($1,000.00), having not more than fifteen years. to run, redeemable in lawful money of the United States of America, at the pleasure of said county of Lyon, after five years from date of issue, and bearing interest, payable semiannually, at the rate of eight per centum (8%) per annum,·which bonds shall be substantially in the form set forth in said bill, to wit, from lines eleven (11) to twenty-nine (29), inclusive, and deliver the same to J. Shade, the treasurer of said Lyon county, Iowa, who is hereby authorized to sell and dispose of said bonds so issued in accordance with said act of the Seventeenth general assembly of the state of Iowa, and for no other purpose whatever. . It is further resolved by the board of supervisors of said Lyon county, Iowa, that two per centum (2%) be, and the same is hereby, appropriated of the bonds herein authorized to be issued, to pay the cost or expenses of preparing, issuing, advertising, and disposing of the same, and that J. Shade is hereby employed as financial agent therefor, with power to employ an assistant, if he so desire, and that all matters herein set forth shall

be done in strict conformity with this resolution and the provisions of said act. The foregoing was approved by all the members of the board of supervisors of Lyon county."

(9) The foregoing resolution was spread upon the records, and is upon page 337 of Book A of the records of the proceedings of the board of supervisors of said county; and the proceeds of this issue of Shade refunding bonds, amounting to $100,000, were used to pay the principal and interest of bonds issued prior thereto, as follows: The amount of $53,500 thereof was used to pay in full all of the $55,000 of judgment bonds heretofore referred to, and which were issued in 1872 and 1873, and which were outstanding and unpaid, being in amount $53,000 of principal and $500 of interest, including the whole of the $6,800 issued upon the judgment in favor of C. A. Greely, and which was reversed in the supreme court of Iowa. The remainder of the proceeds arising from the sale of the issue of Shade refunding bonds of $100,000 issued July 1, 1879, was used to pay said above-mentioned $47,300 of funding bonds, not issued upon, or to pay judgments, with accrued interest thereon, amounting to $1,085, hereinbefore referred to as being issued between October 19, 1871, and February 7, 1878, both dates inclusive, as set forth in finding No. 7.

(10) The following additional judgments were entered against the defendant, Lyon county, at the dates and in the amounts named, to wit:

| | |
|---|---:|
| E. T. Kirk, July 24, 1873 | $2,204 23 |
| James H. Wagner, April 21, 1874 | 672 06 |
| A. J. Harmon, April 21, 1874 | 381 42 |
| Perkins Bros., August 22, 1874 | 815 05 |
| Wilson & Van Saun & Co., May 5, 1875 | 3,850 34 |
| Lyman J. Gage, October 16, 1875 | 4,460 56 |
| C. H. Smith, November 15, 1876 | 233 00 |
| E. T. Drake, May 14, 1878 | 462 67 |
| Swan & Fawcett, May 14, 1878 | 603 00 |
| A. H. Andrews & Co., May 14, 1878 | 107 45 |
| T. C. Thompson, May 14, 1878 | 304 00 |
| Chase & Taylor, May 14, 1878 | 479 10 |

—Which said judgments were satisfied prior to the 1st day of July, 1879, either by the issuance of the bonds set out in paragraph 7, or the proceeds of their sale, or warrants or cash derived from other sources, and that no judgments were rendered against said county after May 14, 1878.

(11) The next bonds issued by the defendant county were issued on January 8, 1880, and that on said date, and at various dates subsequent thereto, up to and including July 1, 1885, there were issued $60,600 of funding bonds, under the provisions of chapter 1, tit. 4, Code 1873; chapter 9, Acts 15th Gen. Assem.; chapter 125, Acts 16th Gen. Assem.; chapter 154, Acts 17th Gen. Assem.; chapter 183, Acts 18th Gen. Assem.; chapter 147, Acts 19th Gen. Assem.; chapter 80, Acts 20th Gen. Assem.,—at dates and in amounts as follows:

| | |
|---|---:|
| January 8, 1880 | $ 600 |
| May 12, 1880 | 11,600 |
| June 1, 1880 | 6,800 |
| November 12, 1880 | 2,400 |
| September 6, 1881 | 4,000 |
| June 13, 1882 | 9,000 |
| September 1, 1884 | 3,100 |
| March 1, 1885 | 3,100 |
| July 1, 1885 | 20,000 |
| Total | $60,600 |

(12) That the whole amount of said bonds was issued for the purpose of taking up outstanding floating warrants against said county, and on the date of the issuance of the last $20,000 thereof, to wit, July 1, 1885, there was over $20,000 of warrants outstanding against said county, which had been outstanding and unpaid more than six months prior to July 1, 1885; said bonds being issued to take up said warrants under a resolution of the board of supervisors of said county of date April 10, 1884, as follows:

"Whereas, the county of Lyon, state of Iowa, has a floating indebtedness in warrants of the different funds of said county; and whereas, the board of supervisors of said county deem it for the best interest of the county to bond the same: Be it therefore resolved by the board of supervisors of Lyon county, Iowa, that the chairman, with the auditor, be authorized to issue bonds in amounts sufficient to cover said indebtedness, and deliver the same to the county treasurer, and take his receipt therefor. Adopted by a full vote of the board."

(13) On May 1, 1885, an issue of $120,000 of refunding bonds was made by the defendant county under the provisions of chapter 58 of the Acts of the Seventeenth General Assembly, and chapter 175 of the Acts of the Twentieth General Assembly, of the state of Iowa, and under a resolution of the board of supervisors of said county of date April 11, 1884, as follows:

"Whereas, it is deemed to be for the public interest to refund the indebtedness of the county of Lyon, state of Iowa, evidenced by the bonds thereof heretofore issued, and outstanding on the 1st day of January, 1884, and to issue the coupon bonds of county: It is therefore resolved by the board of supervisors of said county, in session assembled, to issue coupon bonds of this county in sums not less than one hundred nor more than one thousand dollars, having not more than twenty years to run, redeemable in lawful money of the United States of America, at the pleasure of the county, after five years from the date thereof, and bearing interest, payable semiannually, at 6 per cent. per annum, which bonds shall be substantially in the form given in section 1, ch. 58, 17th General Assembly, and shall bear the date of July 1, 1885, or on the 1st day of any month called for by Miller & Thompson; and the chairman of the board, and the auditor of this board, and auditor of the county are hereby directed to issue same in accordance with said statute and this resolution. In testimony whereof, the said county, by its board of supervisors, has caused this bond to be signed by the chairman of the board, and attested by the auditor, with the county seal attached, this 1st day of May, 1885.
"[Seal.]
            J. G. Anderson,
    "Chairman of the Board of Supervisors.
            "L. C. Thompson,
             "County Auditor."

(14) The issue of $120,000 of bonds of defendant county bearing date May 1, 1885, were sold at the dates, in the amounts, and of the numbers, and to the persons or corporations, as follows, to wit: June 1, 1885, Nos. 01 to 027, to G. B. Provost; June 4, 1885, Nos. 048 to 052, to C. H. Eighmey; June 6, 1885, Nos. 053 to 055, to Dubuque National Bank; August 28, 1885, Nos. 056 to 090, to Ætna Life Insurance Company; September 1, 1885, Nos. 091 to 095, to United States National Bank; September 1, 1885, Nos. 096 to 0105, to Orient Fire Insurance Company; September 2, 1885, Nos. 0106 to 0110, to Connecticut General Life Insurance Company; September 8. 1885, Nos. 028 to 047, to Saving & Trust Company of Cleveland, Ohio; September 20, 1885, Nos. 0111 to 0120, to Hartford Steam-Boiler Inspection & Insurance Company.

(15) The proceeds of the $120,000 issue of bonds of said county dated May 1, 1885, were used to take up and pay off the $100,000 issue of bonds of July 1, 1879, and unpaid interest thereon, and the balance to take up funding bonds of said county outstanding at the date of the issue of said $120,000 of bonds, and the commission for placing of said $120,000 for sale, amounting to $2,438.59.

(16) The bonds in suit in the case of Ætna Life Ins. Co. v. Lyon Co., reported in 44 Fed. 329, being 410 interest coupons for $30 each, were from the said $120,000 of bonds of May 1, 1885, which said bonds were in denominations of $1,000 each.

(17) No other bonds were issued by the defendant county than as set out in this finding of facts. All of the bonds issued by said county prior to the date of the issuance of the bonds in suit were outstanding and unpaid at the time of the issuance of the bonds, except as shown by the facts hereinbefore set forth.

(18) The $100,000 of bonds issued July 1, 1879, were in denominations of $1,000 each, and bore interest at the rate of 8 per cent. per annum, payable semiannually, evidenced by coupons attached to said bonds; and said interest was regularly paid by the defendant county at its maturity, from the issuance of said bonds, up to the date said bonds were taken up and paid off.

(19) The defendant county for each year from the time of its organization, up to and including the year 1886, levied a tax, under the name of the "Bond and Interest Fund," upon the taxable property of the said county; and from the fund derived from said taxation the said county regularly paid the interest upon all of the bonds issued by it up to the 11th day of May, 1887, except that part of the interest on bonds which was paid from the money derived from the sale of bonds, amounting to $661.41 of the $100,000 issue, and $1,585 of the bonds of said county issued prior to the $100,000 issue.

(20) From the treasurer's warrant record (a record kept in due course of business by the defendant county), it appears that on June 1, 1880, there were outstanding against the defendant county warrants in the sum total of $4,259, which were subsequently taken up.

(21) On September 6, 1881, there was outstanding warrant to the amount of $370, which was subsequently paid.

(22) On June 13, 1882, there were outstanding warrants to the amount of $15,225, which were subsequently paid.

(23) On September 1, 1884, there were outstanding warrants to the amount of $25,343, of which $2,663.14 were funded in (that is, exchanged for) bonds on that day issued, and the remainder of the warrants were subsequently paid.

(24) On March 1, 1885, there were outstanding warrants to the amount of $29,466, of which $2,820.09 were funded in (that is, exchanged for) bonds on that day issued, and the remainder of the warrants were subsequently paid.

(25) Portions of the several amounts of warrants shown to be outstanding in the years 1880 to 1885, both inclusive, were drawn against and paid from funds in the county treasury, derived from the taxes of these years; but, from the evidence submitted, the court is not able to state the amounts of the warrants thus paid.

(26) Of the bonds issued in 1878 and 1879, there were paid and canceled prior to June 13, 1882, the amount of $2,400; and prior to September 1, 1884, there were paid and canceled bonds to the amount of $4,300.

(27) On the bonds and coupons owned by the Keene Five-Cent Savings Bank there is due, interest being calculated to December 1, 1898, the sum of $33,275.20; and on the bonds and coupons owned by Eliza J. Faulkner, the sum of $5,504.92, interest being calculated to December 1, 1898; and excluding in both cases coupons No. 14 of the issue of June 1, 1880, No. 10 of the issue of June 13, 1882, and No. 5 of the issue of September 1, 1884, these coupons being barred by the statute of limitations.

J. M. Parsons, for plaintiffs.

E. C. Roach, E. G. Greenleaf, and Simeon Fisher, for defendant.

SHIRAS, District Judge (after stating the facts as above). The first question presented for consideration in the briefs of counsel is that of the jurisdiction of the court, it being claimed on behalf of the defendant that the plaintiff bank was not the original holder of the bonds sued on; that the action is therefore in the name of an assignee, and that the court cannot take jurisdiction, unless that right would exist if the action was in the name of the assignors, from whom the plaintiffs derived title to the bonds sued on; and that, as the evidence shows that the bonds were originally issued to citizens of Iowa, it follows that this court is without jurisdiction. The bonds are made by a corporation, and if they were, in legal effect, payable to bearer when they became the property of the plaintiff, then they come within

90 F.—34

the exception contained in the first section of the act of congress approved August 13, 1888 (25 Stat. 434), which excepts, out of the clause preventing jurisdiction from attaching in favor of an assignee when it would not exist in favor of the assignor, cases based upon foreign bills of exchange, or upon corporate obligations payable to bearer. Counsel for the defendant county place some stress upon the use of the words "made payable to bearer," which are found in some of the cases cited by them, and found thereon the argument that, to come within the exception of the statute, the bond or other corporate obligation must, in terms, or on its face, be made payable to bearer; but the statute does not use the word "made," upon which reliance is placed in the argument of counsel. The language of the statute is, "if such instrument be payable to bearer"; and therefore the question is whether a bond issued in blank (that is, without the name of a payee being inserted), and which in that form is sold, and passes from hand to hand, is or is not, in legal effect, an instrument payable to bearer. If it is, then it comes within the exception, and the question of jurisdiction is not affected by the citizenship of the parties by whom it may have been owned before becoming the property of the person in whose name the action is brought. It is well settled that if a note or bond is made payable to a named person or order, and is by him indorsed in blank, it becomes transferable by delivery, or is, in effect, an instrument payable to bearer. School Dist. v. Hall, 113 U. S. 135, 5 Sup. Ct. 371. The test is whether the plaintiff in the given case, in order to maintain the action, is compelled to rely upon an assignment or indorsement from another as proof of title to the chose in action, or whether such title and consequent right of action will be inferred from possession of the instrument, as the holder or bearer thereof. In White v. Railroad Co., 21 How. 575, it appeared that the railroad company, a Massachusetts corporation, had issued a number of bonds payable in blank, which were sold in the market, and passed from hand to hand, the original purchaser being a citizen of Massachusetts; but the same were finally bought by the plaintiff, White, who was a citizen of the state of New Hampshire, and who inserted his own name as payee, and then brought suit thereon in the United States circuit court in Massachusetts. That court held that, under the facts of the case, it did not have jurisdiction, but the supreme court reversed this ruling, stating in the opinion that:

"The ground upon which this ruling below is sought to be maintained is that these bonds were issued to citizens of Massachusetts, and as they could not be regarded as negotiable instruments, or, if negotiable, not payable to bearer, the plaintiff was disabled from suing in the federal court, within the prohibition of the eleventh section of the judiciary act. Smith v. Clapp, 15 Pet. 125; Bank v. Wister, 2 Pet. 318; Bonnafee v. Williams, 3 How. 574; Sheldon v. Sill, 8 How. 441. In answer to this ground, we think it is quite clear, on looking into the agreed state of facts, in connection with the bonds and the mortgage given to secure their payment, that it was the intention of the company, by issuing the bonds in blank, to make them negotiable and payable to the holder, as bearer, and that the holder might fill up the blank with his own name, or make them payable to himself or bearer, or to order. * * * Assuming, then, that these bonds were intended to be made negotiable, we do not see the difficulty suggested in maintaining the suit in the federal court; for, until the plaintiff chose to fill up the blank, he is to be regarded as holding the bonds as bearer, and held them in this character till made payable to himself or order.".

Under the doctrine thus announced by the supreme court, it must be held that the bonds, which remain payable in blank, are in fact payable to bearer, and the plaintiff bank does not sue thereon as an assignee of another; and therefore jurisdiction exists in the case of all the bonds which remain payable in blank, or in which the blank has been filled by the insertion of the name of the plaintiff.

Coming to the merits of the cases, it appears that the only question involved is whether the bonds sued on, or any part thereof, are invalid because issued in contravention of section 3 of article 11 of the constitution of Iowa, which provides that:

"No county or other political or municipal corporation shall be allowed to become indebted in any manner or for any purpose to an amount in the aggregate, exceeding five per centum on the value of the taxable property within such county or corporation, to be ascertained by the last state and county tax lists, previous to the incurring of such indebtedness."

Under the facts of these cases, the question arises whether the value of the taxable property of the county, upon which the 5 per cent. is to be calculated in determining the amount for which the county could create a valid indebtedness, should be held to include or exclude the exemption under what are known as the "Tree Culture Acts" of the legislature of the state of Iowa. The law in force at the date when the bonds sued on were issued is found in section 1272 of McClain's Code of Iowa for 1888, and reads as follows:

"Sec. 1272. Forest and Fruit Trees. For every acre of forest trees planted and cultivated for timber within the state, the trees thereon not being more than twelve feet apart and kept in a healthy condition, the sum of one hundred dollars shall be exempted from taxation upon the owner's assessment for ten years after each acre is so planted; provided, that such exemption be applied only to the realty owned by the party claiming the exemption, not to exceed each one hundred and sixty acres of land, upon which the trees are grown, and in a growing condition. For every acre of fruit trees planted and suitably cultivated within the state, the trees thereon not being more than thirty-three feet apart and kept in a healthy condition, the sum of fifty dollars shall be exempted from taxation upon the owner's assessment for five years after each acre is planted. Such exemption shall be made by the assessor at the time of the annual assessment, upon satisfactory proof that the party claiming the same has complied with this section; and the assessor shall return to the board of equalization the name of each person claiming exemption, the quantity of lands planted to timber or fruit trees, and the amount deducted from the valuation of his property. Provided, that the amount so deducted shall not exceed one half of the valuation of the realty on which such exemption is claimed."

In section 1271 it is declared that "the following classes of property are not to be taxed, and they may be omitted from the assessments herein required"; and then follow eight classes of property, none of which include the exemptions allowed for tree culture under the provisions of section 1272. From the provisions of these two sections, it is made clear that the realty upon which the trees are cultivated is not intended to be exempted from valuation and assessment, either in whole or in part. If that had been the intent of the legislature, the land would have been included within the classes of property enumerated in section 1271; and, furthermore, the exemption would have been of the land, or a certain proportion of it, instead of a given amount of money. Section 1272 declares that the exemption shall be deducted from the

assessment of the owner of the land, and shall not exceed one-half of the valuation of the realty on which the exemption is claimed. To meet the requirements of the section, it is incumbent on the assessor to place a valuation on (that is, to assess) all the land owned by the party claiming the exemption; then to ascertain and return the quantity of land planted in forest and fruit trees, with the deduction allowed therefor. As the section expressly provides that the deduction must not exceed one-half of the valuation of the realty on which the exemption is claimed, it is clear that the statute requires all the land to be valued by the assessor. Having thus ascertained the value of the land for the purposes of taxation, then the assessor is authorized to deduct from the total sum which would otherwise be entered against the landowner as the amount of his assessment the amount of the exemption allowed under the section in question. The evidence shows that, in making out the tax lists for the defendant county, it was the custom to enter in one column the number of acres owned by each person, in the next column the value of the land, in the next the value of the personalty, in the next the amount of exemptions for trees, and in the next the value for taxation; being the difference left after deducting the amount of the exemption allowed from the total valuation of the realty and personalty. Thus, we have presented the question whether the amount of the constitutional limitation is to be determined by taking 5 per cent. of the total valuation of the property as it is shown on the tax list, or by taking 5 per cent. of the assessment returned against the property owners. The language of the constitution is "five per centum on the value of the taxable property within such county or corporation, to be ascertained by the last state and county tax lists." If section 1272 exempted from taxation a named number of acres, out of a larger number devoted to tree culture, then the value of these would not be included in the taxable property of the county; but that is not the fact. The statute requires the assessor to place upon the tax list, and to value for taxing purposes, all the lands, regardless of the fact that a portion thereof may be devoted to tree culture. This being done, then, if the owner claims an exemption for tree culture, the assessor must ascertain the facts, and determine whether the property owner is entitled to a deduction. If the exemption is allowed, no part of the property is declared nonassessable, nor is the valuation placed thereon reduced in amount upon the tax list, but the total amount of the assessment against the owner for realty and personalty is reduced by the deduction of the exemption allowed. In effect, this is but the payment of a bounty to landowners, to encourage the culture and growth of trees. The constitutional provision requires the ascertainment of the value of the taxable property in the county, and not the amount of the assessments entered up against the property owners. All the land in the defendant county, including that devoted to tree culture, was liable to taxation during the years when the bonds sued on were issued, except such as was exempt under section 1271; and the assessors were bound, under the law, to assess the valuation thereof, regardless of the question whether any portion was planted in trees or not; and this valuation was required to be, and was in fact, entered upon the tax lists as the assessable value of the land. Under these circumstances, it seems clear that

it is this assessed value of the realty and personalty as shown upon the tax lists that must be resorted to in determining the value of the taxable property in the county as the basis for ascertaining the limit of lawful indebtedness incurrable by the county. Counsel have not cited any decision by the supreme court of Iowa upon the proper construction of this clause of the constitution; and, in the absence of a ruling of that court upon the question, I shall hold, as indicated, that the value of the taxable property in the county includes the valuation put on the realty and personalty in the tax lists, without deducting therefrom any amounts allowed to the property owners as exemption under the tree culture acts.

The next and perhaps the most material question arising in the cases is whether, in ascertaining the amount of indebtedness outstanding against the county at the several dates when the bonds sued on were issued, the series of bonds issued under date of July 1, 1879, to the amount of $100,000, and known as the "Shade Bonds," are to be recognized as existing claims against the county; for, if they are to be included in the outstanding indebtedness of the county, then the limit had been exceeded before any of the bonds sued on were issued. The facts show that this issue was itself in excess of the constitutional limit, and therefore these bonds did not create a valid or enforceable indebtedness against the county; and in the case of Lyon Co. v. Ashuelot Nat. Bank, 30 C. C. A. 582, 87 Fed. 137, it was held by the circuit court of appeals for this circuit that the fact that in 1885 these bonds were retired by the proceeds of another series of bonds issued and sold by the county would not validate the Shade bonds as of any date prior to the date of their payment; and, under the ruling in this case, it is clear that the Shade bonds cannot be included as part of the indebtedness existing when the bonds sued on were issued, as they all bear date before May 1, 1885, and the Shade bonds were not taken up, as above stated, until after that time.

It is admitted by counsel for the defendant county that, if the Shade bonds are not to be computed as part of the existing indebtedness of the county, then no defense exists to the bonds issued June 1, 1880, and September 6, 1881; and therefore the next inquiry is as to the validity of the issue of June 13, 1882. At this date the total value of the property in Lyon county for the purposes of taxation was the sum of $1,149,-773; being the total valuation of the taxable property as shown by the tax lists for 1881, without deducting therefrom the exemptions allowed for tree culture. Upon this basis the limit of indebtedness would be the sum of $57,488.65, or, if the 5 per cent. be calculated on the sum left after deducting the tree culture exemptions, the limit would be the sum of $48,912.95. On behalf of the defendant it is claimed that there were outstanding on June 13, 1882, unpaid warrants to the amount of $15,225, which amount is not in dispute, and that in addition thereto there should be counted warrants to the amount of $3,244, which it is claimed the evidence shows were issued for claims that were in existence before June 13, 1882, the date of the bonds now in issue, although the warrants bear dates subsequent to that time. Thus, the question arises whether unliquidated claims which have not been presented for allowance to the county board of supervisors can be included in the ex-

isting indebtedness of the county, in determining whether the debt limit had been reached on a given date. Must a person, when about to purchase an issue of county bonds, ascertain, at his peril, every possible claim which may thereafter be presented to the county board and be allowed? If so, no one can ever know whether he may safely purchase the bonds or not, for it is impossible for him to interrogate every person who might hold a claim; and, furthermore, if the person, although he had a claim, should deny it, the would-be purchaser could not rely on the denial, for that would not be binding upon the county, and, if he bought the bonds, the validity could be questioned by the county, upon the showing that the person inquired of in fact did have or hold a claim, which was subsequently allowed, of an amount sufficient to invalidate the bonds. If it be held that claims against a county which have never been filed in any county office, which have never been presented to the county board for allowance, of which no record can be found in any county office, can be subsequently relied upon to defeat the validity of bonds otherwise legal and binding, then it is made impossible for a purchaser ever to ascertain whether the bonds offered him are valid or not. Such a construction of the law would practically defeat the purpose and intent of the statutes authorizing counties to issue negotiable bonds; for it would render their validity so uncertain that no purchasers could be found, except at figures so low as to work the financial ruin of the county. The rule to be followed is that enunciated by the supreme court in U. S. v. Kirby, 7 Wall. 482, wherein it is said:

"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd result. It will always be presumed that the legislature intended exceptions to its language which would avoid results of this character. The reason of the law in such cases should prevail over its letter."

The Code of Iowa (section 3528) enacts that:

"No action shall be brought against any county on an unliquidated demand, until the same has been presented to such board and payment demanded and refused or neglected."

The practice is to file the claims, duly sworn to, with the county auditor, who is, ex officio, the clerk of the board of supervisors, and then the same come before the board for its action. By thus invoking the action of the county board, a claim is asserted against the county, and in such form that notice thereof can be taken by all interested. Until a claim is thus presented, it cannot be known whether the holder thereof will ever present it or seek to assert it. Can it be fairly said, within the meaning of the constitution, that a county is indebted on a claim which the holder thereof has never presented against the county, and which the county board has never acted upon and allowed, or refused to allow? Until presented for allowance to the county board, the claim is one upon which no action can be maintained in a court, and for which no payment can be made from the county funds. Is a purchaser of county bonds compelled, at his peril, to take notice of inchoate claims of this character, which may never ripen into enforceable debts, and of the amount of which he cannot possibly obtain accurate knowledge? To so hold would make it impossible for the county officers, or a proposed purchaser of county bonds, to determine the amount of the

county indebtedness at any given date, and thus it would be made impossible to determine the amount of the indebtedness which could be lawfully created at any given time.     To avoid this difficulty, and the injurious results flowing therefrom, it must be held that, so far as unliquidated claims are concerned, they cannot be deemed to be debts, within the constitutional limitation, until the holder has taken steps to assert the claim against the county by presenting it for allowance, and has thereby made it possible to ascertain from the county records the amount of the claim asserted against the county.     There may be cases which should be held to be exceptions to this rule, owing to the fact that the existence of the claim was a matter of public notoriety; but such ground of exception does not exist with respect to the claims now under consideration, and therefore it cannot be held that the unliquidated claims not presented for allowance until after the issuance of the bonds sued on should be taken into consideration in determining the amount of the county indebtedness at the date of the issuance of the bonds.

According to the claim of the defendant in the brief filed, the amount of the bonds outstanding on June 13, 1882, was $133,400, which amount includes the Shade issue of $100,000, which, as already stated, cannot be included in the computation; and thus the amount is reduced to $33,400. It is further admitted that, of this amount, the evidence shows that $2,400 had been canceled before June 13, 1882; and thus the amount of bonds outstanding at that date is reduced to $31,000.     Adding to this amount the warrants claimed to be outstanding at that date, and we have a total of $46,225 as the debt of the county on June 13, 1882, not including the $9,000 of bonds issued under that date, which being added would make the total $55,225, or an amount within the constitutional limit, if the 5 per cent. is to be calculated on the basis of the valuation of the taxable property of the county, without deducting the allowances made to the property owners under the tree culture acts.

The next issue of bonds was that of September 1, 1884, amounting to $3,100.     The tax list for 1883 shows that the value of the taxable property in the county for that year was the sum of $1,561,471, or, excluding the allowances under the tree culture acts, the sum of $1,384,289.     Upon the former basis the debt limit would be $78,073.55, and upon the latter, $69,214.45.     According to the contention of defendant's counsel, the number of bonds outstanding on September 1, 1884, exclusive of the Shade bonds, was $42,400, and of warrants, $25,850, or a total of $68,250; but from this total must be subtracted the amount of the bonds which had been paid and canceled before September 1, 1884, amounting to $4,300, which leaves a total of $63,950, and adding thereto the bonds issued on that date would bring the final total up to $67,050, or a sum clearly within the limit, whether calculated on the basis of excluding or including the tree culture allowances in the valuation of the taxable property of the county, and without making allowance for the warrants which had been exchanged for bonds up to that date.

We thus reach the last issue of bonds, being those issued under date of March 1, 1885, none of which are held by the Keene Five-Cent Sav-

ings Bank. The valuation of the taxable property of the county upon the last preceding tax list was at that date the sum of $1,580,735, or, deducting the tree culture allowances, the sum would be $1,437,527; thus making the 5 per cent. debt limit either $79,036.75, or $71,776.35, according to the basis of valuation adopted. At this time there were outstanding bonds to the sum of $41,200, and warrants to the amount of $29,466, or a total of $70,660. It thus appears that the outstanding debt of the county had not reached the restrictive limit of the constitution when the county authorities determined to issue the series of bonds of which those held by the plaintiff Faulkner form part. The bonds were authorized and issued for the purpose of funding then existing and outstanding indebtedness. The evidence shows that part thereof were directly exchanged for outstanding warrants, and part were sold for cash, and the money was used in paying up other parts of the warrants of the county. The evidence fails to show that as a result of the issuance of this series of $3,100 of bonds, and the retirement of the county warrants caused thereby, the debt of the county was so enlarged as to reach or exceed the constitutional limit. As the legislature has conferred full authority upon the county to issue negotiable bonds for the purpose of funding the pre-existing warrant debt, every presumption is in favor of the validity of the bonds issued by the county; and to defeat bonds thus issued, and held by innocent purchasers for value, on the ground that the issuance thereof caused the debt of the county to exceed the constitutional limit, the necessary facts must be clearly proven, the burden thereof being upon the defendant. City of Huron v. Second Ward Sav. Bank, 30 C. C. A. 38, 86 Fed. 272.

The conclusion reached is that in each case the bonds sued on must be held to be valid, and the plaintiff is entitled to judgment for the amount due upon the bonds and coupons sued on, except such coupons as had matured more than 10 years before these actions were brought; it having been decided by the supreme court in Amy v. Dubuque, 98 U. S. 470, that the statute of limitations is applicable to coupons, whether attached to or detached from the bonds with which they were issued. These suits were brought August 10, 1897, and therefore the statutory limitation of 10 years bars only the coupons that had matured before August 10, 1887, which includes coupons No. 14 of the bonds issued June 1, 1880, No. 10 of the issue of June 13, 1882, and No. 5 of the issue of September 1, 1884. Omitting these coupons, the amount due to the Keene Five-Cent Savings Bank, including the principal of the bonds, and interest thereon from the maturity of the bonds up to December 1, 1898, and the coupons, with interest from the maturity thereof to the date named, is the sum of $33,275.20, for which amount judgment will be entered for plaintiff in that case. Upon the same basis, the total amount due to Eliza J. Faulkner is the sum of $5,504.92, for which sum judgment will be entered in her favor in the second case.